IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| MUD BUDDY, LLC, a Utah Limited Liability Company,<br><br>Plaintiff – Counterclaim Defendant,<br><br>v.<br><br>GATOR TAIL, LLC, a Louisiana Limited Liability Company,<br><br>Defendant - Counterclaimant. | **MARKMAN ORDER (MEMORANDUM DECISION)**<br><br>Case No. 2:08-CV-0972- DN-PMW<br><br>Judge David Nuffer |

## I.    INTRODUCTION

This matter comes before the Court for construction of claims contained in United States Patent No. 6,302,750, entitled "Marine Motor Drive Assembly" ("the '750 Patent") and United States Patent No. 6,361,388, entitled "Marine Motor Drive Assembly" ("the '388 Patent"), (collectively "the Patents"). Plaintiff Mud Buddy, LLC ("Mud Buddy") alleges that defendant Gator Tail, LLC ("Gator Tail") is infringing the Patents. (See Dkt. #20). A hearing was held in this matter on June 1, 2012 ("*Markman* Hearing"), pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), during which the Court verbally indicated its construction of the relevant claim terms, and ordered the parties to prepare a proposed order reflecting that ruling. The parties prepared this proposed order in compliance with the Court's direction. The parties hereby stipulate (except as otherwise indicated) that the form of this proposed order reflects the substance of the Court's ruling at the *Markman* Hearing, but the parties expressly reserve their objections to the substance of this proposed order based on their respective proposed claim

1

constructions as reflected in their briefing for and arguments at the *Markman* Hearing.

For the '750 Patent, the following terms are at issue:

1. Marine mud motor,
2. Drive shaft,
3. Area, formed between the inner and outer seals, configured to contain pressurized lubricant
4. Roller bearing,
5. Oriented to stop lubricant flow from the housing cavity,
6. Oriented to allow lubricant flow away from the bearing,
7. Lubricant chamber,
8. Pressurized lubricant,
9. Pressurization gap,
10. The outer seal and inner seal are one-way seals positioned in opposing flow directions, and
11. Spaced apart from the outer seal.

For the '388 Patent, the following terms are at issue:

1. Elongate drive tube,
2. Inner seal, and
3. Outer seal.

## II.     LEGAL STANDARD

Claim construction is the process by which a court determines the meaning of the patent claims. Though the patents should contain substantial information on the invention and relevant technology, the patent claims determine the scope of the patent owner's right to exclude. In *Markman v. Westview Instruments Inc.*, the Supreme Court held claim construction is a matter of law and a threshold issue for the trial court. 517 U.S. 370, 372, 116 S. Ct. 1384 (1996). Thus, most patent cases include a "Markman" hearing in the pretrial procedures, where the court resolves disputes over the patent claims' meanings.

In *Phillips v. AWH Corp.*, the Federal Circuit restated claim construction's basic principles and reiterated the goal is to determine the claims' meanings to a person of ordinary skill in the art at the time the patent application was filed. 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("The descriptions in patents are not addressed to the public generally, to lawyers or to judges,

but, as [35 U.S.C. § 112] says, to those skilled in the art to which the invention pertains or with which it is most nearly connected") (quoting *In re Nelson*, 280 F.2d 172, 181 (C.C.P.A. 1960)). "At the time" means "[a] claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date." *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005). "[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing." *Kopykake Enters. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001).

Claims are either independent or dependent. Dependent claims "refer[] back to and further limit[] another claim or claims in the same application." 37 C.F.R. § 1.75(c). The person of ordinary skill in the art is a theoretical construct. It is a person who is presumed to be aware of all the pertinent prior art and who possesses all the skills, experience, and education commensurate with the sophistication of the particular technology. *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

The Court may draw from four sources of evidence to construe claims. In the order of priority, these sources are:

1. The claim language;
2. The patent's remaining portions, known as the "specification;"
3. The patent application's history with the patent office, known as the "prosecution history" or "file history" (e.g., the communications back and forth between the patent examiner and the applicant); and
4. Limited extrinsic evidence to assist with understanding the background technology and the state of the art.

The first three sources of evidence are "intrinsic" evidence. The fourth is extrinsic evidence and can be used in claim construction, but only in limited circumstances because

"undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the [intrinsic record] thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1318-1319 (citation omitted). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper."

The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The patent claims' words define the scope of the patent owner's monopoly. *Phillips*, 415 F.3d at 1312 (citation omitted). "A claim construction analysis must begin and remain centered on the claim language itself . . . ." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

Because the claim language determines the invention's scope, the claim language is always the proper starting point. *Comark Commc'n., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Unless ambiguous or otherwise clearly modified by other intrinsic evidence,

claim terms have the ordinary and customary meaning as understood by a person of ordinary skill in the relevant art at the time the patent application was filed. *Phillips*, 415 F.3d at 1312-13 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation") (citation omitted).

After consulting the claim language, analysis proceeds to the patents' specifications. Section 112 states the specification must contain a written description in sufficient detail as to enable one skilled in the art to practice the claimed invention. Thus, the claims are read in view of the specification. The specification helps define claims because it "inform[s] the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1346 (Fed. Cir. 2010).

"[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Extrinsic evidence is any evidence not part of the patent's claims, specification, or prosecution history. Because patents frequently involve technology unfamiliar to the court, extrinsic evidence may provide background information and assist in understanding how the invention works, or whether a particular claim term has a specialized meaning to a person of ordinary skill in the art. *Phillips*, 415 at 1318. Background extrinsic information may be presented through expert testimony, dictionaries, or technical treatises. *See id.* at 1317-18 (discussing types of extrinsic evidence). And, because the patent claims are to be construed as would be understood by one having ordinary skill in the art at the time of the patents' effective

filing dates, extrinsic evidence may be taken to "demonstrate the state of the prior art at the time of the invention." *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

### III.   DISCUSSION

**A. The '750 Patent**

####    1   Marine Mud Motor.

The term "marine mud motor" appears in the preambles to the asserted claims in both Patents. "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Mud Buddy proposes that "marine mud motor" be construed simply as a marine motor capable of operating in shallow water applications where mud can be present. Gator Tail proposes a definition of a "marine mud motor" importing details from the specification into the claim:

> A specialized marine motor of the type shown in the figures of the '750 patent and has a design that (i) has been used for more than 30 years in the U.S. and Asia from the filing date of the '750 patent and that (ii) has a long drive tube that encases a drive shaft that is three to seven feet in length and that (iii) allows the mud motor's propeller to ride gently over obstacles encountered while under propelling power.

Based on the canons of construction and this Court's reading of the Patents, Mud Buddy's reasoning articulated in its briefing, and the record evidence, the Court construes "marine mud motor" to mean:

> A marine motor capable of operating in shallow water applications where mud can be present.

####    2   Drive Shaft

The parties dispute the meaning of a "drive shaft."[1] Mud Buddy proposes that the term

---

[1] The term "drive shaft" appears in the preamble of claim 1 of the '750 Patent, dependent claim

6

"drive shaft" be defined as a shaft for driving a propeller. Gator Tail proposes that the term "drive shaft" be construed to mean a shaft that is powered for rotation and is three to seven feet in length.

The Court will not import the specification's length limitation into the claim language. Gator Tail's proposed construction omits the fact that the shaft drives a propeller. Mud Buddy's proposed construction omits the fact that the shaft is powered. Based on the canons of construction, this Court's reading of the Patents, Mud Buddy's reasoning articulated in its briefing, and the record evidence, the Court construes "draft shaft" to mean:

A powered shaft for driving a propeller.

### 3    Area, formed between the inner and outer seals, configured to contain pressurized lubricant.

The parties next dispute the meaning of the claim term "area formed between the inner and outer seals configured to contain pressurized lubricant."[2] Mud Buddy proposes that the term mean an area or space located between the inner and outer seals capable of containing a pressurized lubricant. Gator Tail proposes that the claim term mean an area formed by spacing apart the inner seal from the outer seal, such area being able to contain pressurized lubricant.

Here, Gator Tail's proposed construction imports claim limitations from the specification and presumes that no part of the seals can be touching. The claim language at issue does not preclude any portion of the seals from touching, but rather merely requires an "area, formed between the inner and outer seals, configured to contain pressurized lubricant."

The Court believes construction of this claim term involves the application of the widely

---

11, and dependent claims 15 and 16. It also appears in each of the independent claims of the '388 Patent.
[2] This claim term is found in independent claim 1 of the '750 Patent.

accepted meaning of commonly understood words. "If the claim language is clear on its face, then [] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Compuserve Inc.*, 256 F.3d at 1331. Based on the canons of construction and this Court's reading of the Patents, Mud Buddy's reasoning articulated in its briefing, and the record evidence, the Court adopts Mud Buddy's proposed construction of:

> An area or space located between the inner and outer seals capable of containing a pressurized lubricant.

### 4      Roller Bearing

The parties dispute the meaning of a "roller bearing." [3] Mud Buddy proposes that the term be construed as a mechanism for supporting a radial load while facilitating rotation of two surfaces relative to each other. Gator Tail proposes that the term be defined how it is used as it is ordinarily understood in mechanical engineering with the addition of the terms defined in the '750 patent, namely, that the roller bearing generates hydraulic pressure on its lower end due to its accelerated rotation and slope.

Neither party's proposed definition adequately captures the meaning of this claim term. Gator Tail's proposed definition would import limitations from the specification, which states: "Hydraulic pressure is generated on the lower end of the bearing due to its accelerated rotation and slope." ('750 Patent, col. 2, lines 62-64). Mud Buddy's proposed definition eliminates the functional aspect of the roller bearing in the context of the invention.

The patent claims the roller bearing functions as part of the invention to create grease-moving pressure within the drive assembly, thus this Court believes the structure and meaning to one of ordinary skill in the art may be discerned from the claim language. The roller bearing is

---

[3] The term "roller bearing" appears in the '750 patent for independent claim 14 (and, correspondingly, dependent claims 15 and 16) as well as dependent claims 3, 4, 13, 19 and 20.

claimed to generate "pressure" so as to force lubricant past the inner seal. Based on the canons of construction and this Court's reading of the Patents, the parties' reasoning articulated in their briefing, argument at the *Markman* hearing, and the record evidence, the Court construes "roller bearing" to mean:

> A bearing in which the main load is transferred through rolling contact rather than in sliding contact, and which generates hydraulic pressure.

### 5        Oriented to stop lubricant flow from the housing cavity

The parties next dispute what is meant by the outer seal being "oriented to stop lubricant flow from the housing cavity."[4] Mud Buddy proposes that the Court should construe the phrase to mean an outer seal placed in the housing cavity so as to act in combination with the inner seal to restrict lubricant flow from exiting the housing cavity. Gator Tail proposes that this limitation means the orientation of the outer seal to stop lubricant flow from exiting the lower end of the drive assembly.

The Court finds that the word "stop" is capable of understanding, and declines to substitute the word "restrict." The Court adds the word "housing" to Gator Tail's proposed construction to clarify that it is the drive assembly housing from which the lubricant might exit. Based on the canons of construction and this Court's reading of the Patents, Gator Tail's reasoning articulated in its briefing and the record evidence, the Court construes "oriented to stop lubricant flow from the housing cavity" to mean:

> The orientation of the outer seal to stop lubricant flow from exiting the lower end

---

[4] This limitation is found in the '750 Patent in independent claim 1, independent claim 7, and independent claim 14.  The phrase is not found in independent claim 17, which contains the step of "preventing lubricant from flowing out of the assembly housing by orienting an outer one-way seal in the lower end of the assembly housing."  In the '388 Patent, independent claim 14 contains a variation of this limitation: "oriented to restrict fluid from flowing in the direction from the upper end of the enlarged drive assembly housing to the lower end of the enlarged drive assembly housing."

of the drive assembly housing.

### 6      Oriented to allow lubricant flow away from the bearing.

The parties stipulated during the course of the *Markman* proceedings on a meaning for this term. The Court adopts that stipulated meaning as:

> The one-way inner seal is oriented to allow lubricant to flow away from the bearing and past the inner seal.

### 7      Lubricant Chamber

The parties next dispute the meaning of "lubricant chamber."[5] Mud Buddy proposes that the Court define lubricant chamber to mean a lubricant chamber that is located between inner and outer seals and which chamber contains pressurized lubricant. Gator Tail proposes a lubricant chamber that is located between spaced apart inner and outer seals and which chamber is pressurized by pressurized lubricant that has flowed past the inner seal. Similar to the claim term regarding "an area, formed between the inner and outer seals, configured to contain pressurized lubricant," the disagreement appears to be whether the inner and outer seals must be "spaced apart."

The intrinsic record does not suggest that spacing the seals apart means that no portion of one seal may touch a portion of the other seal. Moreover, the claims do not require such a configuration and there is no clear disavowal of claim scope in the intrinsic record as stated in Mud Buddy's briefing. In light of the overall teachings of the Patent, however, the Court believes it is instructive to include a description that the lubricant chamber contains lubricant that has flowed past the inner seal. This addition helps orient the reader as to where this lubricant chamber is and that it functions to receive the lubricant. Accordingly, the Court construes this

---

[5] "Lubricant chamber" is a limitation in dependent claim 5 (and, correspondingly, dependent claim 6), dependent claim 9, and independent claim 14 (and, correspondingly, dependent claims 15-16) of the '750 Patent.  Independent claim 17 of the '750 Patent merely uses the term "chamber."

claim term as meaning:

> A lubricant chamber that is located between inner and outer seals and which chamber contains pressurized lubricant that has flowed past the inner seal.

### 8    Pressurized Lubricant

The parties next dispute the meaning of the term "pressurized lubricant."[6] Mud Buddy proposes that pressurized lubricant is "a lubricant that is under pressure." Gator Tail proposes that pressurized lubricant is "lubricant at a pressure above the pressure acting on the outer seal from outside the drive housing whether the drive is running or at rest."

The claim language does not require the lubricant to be pressurized at all times, whether the drive is running or at rest as stated in Mud Buddy's briefing. However, the Court finds the pressure difference as compared to external pressure to be an important characteristic of the pressurized lubricant as stated in Gator Tail's briefing.

Therefore, the Court construes "pressurized lubricant" to mean:

Lubricant at a pressure above the pressure acting on the outer seal from outside the drive housing."

### 9    Pressurization Gap

The parties next dispute the meaning of "pressurization gap" in the '750 Patent.[7] Mud Buddy proposes that the pressurization gap is "the gap formed between the pressurization member and the inner seal." Gator Tail proposes the "pressurization gap" to be "the gap formed between the roller bearing and inner seal and which gap provides an area for the roller bearing to

---

[6] "Pressurized lubricant" is a limitation in the '750 Patent in independent claim 1 (and, correspondingly, dependent claims 2-6), and dependent claim 12 in the '750 Patent. Independent claim 14 (and, correspondingly, dependent claims 15-16) specify "pressurized grease." Dependent claims 9 and 17 speak in terms of "pressurizing" the chamber, and dependent claims 10, 18, and 19 specify the act to "pressurize lubricant."

[7] "Pressurization gap" is mentioned in dependent claim 4 (depending from independent claim 1), claim 10 (depending from independent claim 7), independent claim 14, and dependent claims 18 and 19 (both of which depend from independent claim 17).

generate lubricant pressure so that the lubricant is forced past the inner seal."

The Court does not find the claim language to be limited to roller bearings and chooses not to import limitations from the specification into the claims. The Court finds that the pressurization gap's function in providing an area for pressure to build is important to the term. The Court further finds that the pressurization gap's additional function of making lubricant flow past the inner seal is described in the language of claims 9 and 10. Therefore, the Court construes "pressurization gap" to mean:

> The gap formed between the bearing and the inner seal which gap provides an area for pressure to build.

### ⓾ The outer seal and inner seal are one-way seals positioned in opposing flow directions.

The parties dispute the meaning of the phrase "the outer seal and inner seal are one-way seals positioned in opposing flow directions."[8] Mud Buddy proposes that the phrase means "the the outer and inner seals are positioned so that the non-flow direction of one seal is opposite from the other seal forming an area between the seals configured to contain pressurized lubricant." Gator Tail proposes that the phrase means "the outer and inner one-way seals are positioned so the non-flow direction of one seal is opposite from the other." In their Joint Claim Construction and Prehearing Statement, the parties stipulated to the definition of one-way seal as "a seal capable of and designed to allow the passage of fluid in one direction past the seal and stop passage of fluid past the seal in the opposite direction."[9]

Based on the canons of construction and this Court's reading of the Patents, the parties' briefing, argument at the *Markman* hearing, and the record evidence, the Court construes this

---

[8] This phrase is only found in dependent claim 6. Dependent claim 12 specifies that the "outer and inner seals are both one way seals, directionally flow oriented to capture pressurized lubricant between the seals."
[9] Docket Entry #50 at 3.

term to mean:

> The outer and inner seals each permit flow in only one direction and are positioned so the direction of flow through one seal is opposite the direction of flow through the other seal.

### 1  Spaced apart from the outer seal

The parties next dispute the meaning of "spaced apart from the outer seal."[10] Mud Buddy proposes that this phrase means that the "[i]nner and outer seals are placed within the drive assembly such that there is a space between the seals." Gator Tail proposes that the "[s]eals are spaced sufficiently apart from one another to provide an area between the seals that can provide for the containment of pressurized lubricant."

Similar to the reasoning articulated for the term "area, formed between the inner and outer seals, configured to contain pressurized lubricant" the Court believes that the inner and outer seals need only be placed within the drive assembly such that there is space between the seals. Consequently, the Court construes "spaced apart from the outer seal" to mean:

> Inner and outer seals are placed within the drive assembly such that there is space between the seals.

## B  The '388 Patent.

### 1  Elongate drive tube

Within the '388 Patent, the Parties first dispute the meaning of the term "elongate drive tube."[11] Mud Buddy contends that elongate drive tube be defined as "a tube that is of sufficient length to encase a drive shaft." Gator Tail proposes to define elongate drive tube as "a tube that is of sufficient length to receive a drive shaft that is three to seven feet in length."

Similar to the dispute regarding construction of "drive shaft," none of the claims in the

---

[10] "Spaced apart" is only found in Independent claim 7 (and, correspondingly, dependent claims 8-13) of the '750 Patent.

[11] The term "elongate drive tube" is found in each of the independent claims (1, 7, and 14) of the '388 Patent.

13

'388 Patent specifies any length of the elongate drive tube. For same reasoning articulated for construction of the term "drive shaft," this Court adopts Mud Buddy's proposed construction of elongate drive tube as: A tube that is sufficient of length to encase a drive shaft.

### 2      Inner Seal

The Parties next dispute the meaning of the term "inner seal" within the context of the '388 Patent.[12] Gator Tail proposes to define "inner seal" in the '388 Patent to mean "a seal that is positioned nearer the upper end of the enlarged drive assembly housing tha[n] the outer seal and which is oriented to prevent the escapement of pressurized lubricant from the upper end of the enlarged drive assembly housing." Mud Buddy proposes that the term means "a seal located in a drive assembly housing near the outer seal and between the outer seal and an upper end of the drive assembly," the meaning stipulated to by the parties with respect to use of that term in the '750 Patent.

The Court believes the differences between the claims of the '388 Patent and the '750 Patent justify departure from the Parties stipulated meaning of the term "inner seal" within the context of the '750 Patent. The Court adopts components from each party's proposed construction and construes "inner seal" within the context of the '388 Patent to mean:

> A seal located in an enlarged drive assembly housing near the outer seal and between the outer seal and an upper end of the enlarged drive assembly housing oriented to restrict fluid from flowing in a direction from the lower end to the upper end of the enlarged drive assembly housing.

### 3      Outer Seal

With respect to the '750 Patent, the parties stipulated that "outer seal" means "[a] seal suitable for marine propulsion applications that is located in the lower end of a drive assembly

---

[12] "Inner seal" appears in the '388 Patent in independent claim 14.

housing."[13] Mud Buddy proposes the same definition of "outer seal" as in the '750 Patent. Gator Tail proposes to define "outer seal" in the '388 Patent to mean "a seal that is mounted into the lower end of the drive housing and is oriented to prevent the escapement of pressurized lubricant from the lower end of the enlarged drive assembly housing."

As with "inner seal," the Court believes that a departure from the stipulated meaning of the term "outer seal" in the '750 Patent is justified. Based on the canons of construction and this Court's reading of the Patents, the Parties' reasoning articulated in the briefing, , and the record evidence, the Court construes "outer seal" within the context of the '388 Patent to mean:

> A seal located in the lower end of an enlarged drive assembly housing oriented to restrict fluid from flowing in a direction from the upper end to the lower end of the enlarged drive assembly housing.

Dated July 4, 2012.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[13] "Inner seal" appears in the '388 Patent in independent claim 14.